Susan DETWILER and Lloyd Detwiler, Plaintiffs,

v.

BRISTOL–MYERS SQUIBB CO., Surgitek, Inc., Medical Engineering Corp., "21" International Holdings, Inc., f/k/a Knoll International Holdings Inc., Successor by Merger to Scotfoam Corp. and Foamex Products, Inc., Foamex, L.P., a Delaware Limited Partnership, Dow Corning Corp., the Dow Chemical Co., Norman Orentreich, M.D., and Norman Orentreich, M.D., P.C., Defendants.

No. 93 Civ. 4507 (LLS).

United States District Court, S.D. New York.

April 20, 1995.

Roemer and Featherstonhaugh, P.C., New York City, for plaintiffs (Jeffrey Conklin, of counsel).

Martin, Clearwater & Bell, New York City, for defendant Norman Orentreich (Stacie L. Young, of counsel).

## MEMORANDUM AND ORDER

STANTON, District Judge.

Susan Detwiler sues Dr. Orentreich,[1] who administered injections of silicone into her face, for medical malpractice and fraud.[2] She sues the other defendants on a variety of theories for injuries allegedly caused by silicone gel breast implants. Her husband asserts a claim for loss of consortium against all defendants.

Dr. Orentreich now moves to dismiss the medical malpractice claim as time-barred, and the complaint as failing to state a claim for fraud. Plaintiffs cross-move for leave to amend the present Amended Complaint.

---

1. He and Dr. Orentreich, P.C., his professional corporation, are referred to collectively as "Dr. Orentreich."

2. She has withdrawn her battery claim. (Plaintiffs' Memorandum in Opposition to Motion to Dismiss and in Support of Motion to Amend, at 2) [hereinafter "Plaintiffs' Memorandum."]

## BACKGROUND

Mrs. Detwiler first sought treatment from Dr. Orentreich in April 1978. (Amended Complaint, ¶ 99.) From then through September 1980, Dr. Orentreich treated her by injecting silicone directly into her facial tissues. (*Id.* ¶ 100.)

Mrs. Detwiler alleges that Dr. Orentreich provided her with incomplete and inaccurate information about the risks of the silicone injections. Specifically, she claims he failed to tell her that silicone could cause autoimmune diseases; that her body could reject the silicone; that physical scarring, infection, and pigmentation changes could occur; that the silicone could migrate within her body or shift position; and that silicone had not been approved by the FDA for injection into the human body.

Mrs. Detwiler also claims that Dr. Orentreich represented that silicone was safe for injection when it was in fact unsafe. (*Id.* ¶¶ 101–02.) She alleges that Dr. Orentreich knew or should have known of the potential risks at the time he treated her. If she had known about the possible complications, Mrs. Detwiler says, she would not have consented to the treatment. (*Id.* ¶ 104.) The Detwilers filed their complaint on July 2, 1993.

## DISCUSSION

### A. Standards

In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Sheppard v. Beerman*, 18 F.3d 147, 150 (2nd Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994) (citations omitted).

Fed.R.Civ.P. 15(a) requires that leave to amend "be freely granted when justice so requires." A district court "is justified in denying an amendment if the proposed amendment could not withstand a motion to dismiss." *Journal Pub. Co. v. American*

*Home Assurance Co.*, 771 F.Supp. 632, 635 (S.D.N.Y.1991) (internal quotations omitted).

### B. Medical Malpractice Claim

Plaintiffs assert a claim against Dr. Orentreich for "professional negligence." The parties agree that the claim is one of medical malpractice. (*See* Plaintiffs' Memorandum, at 11; Defendants' Memorandum in Support of Motion to Dismiss, at 4–6.)

Under New York law, a medical malpractice action "must be commenced within two years and six months of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure." N.Y.Civ. Prac.L. & R. 214–a (McKinney 1995). The medical malpractice claim is time-barred because the action was not commenced until 12 years after Dr. Orentreich last treated Mrs. Detwiler.

■ A physician may be equitably estopped from asserting a statute of limitations defense if the plaintiff was induced "by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli*, 44 N.Y.2d 442, 448, 406 N.Y.S.2d 259, 262, 377 N.E.2d 713, 716 (1978). He is estopped only if he knew of the alleged malpractice before the statute of limitations had run and intentionally concealed it from the patient, inducing reliance and forbearance from suit. *Hoemke v. New York Blood Center*, 720 F.Supp. 45, 46 (S.D.N.Y.1989), *aff'd*, 912 F.2d 550 (2nd Cir.1990).

■ Plaintiffs contend that Dr. Orentreich is estopped from raising the statute of limitations defense. They seek to amend the complaint to allege that Dr. Orentreich made fraudulent representations and failed to make disclosures after the alleged acts of medical malpractice, in an attempt to conceal that malpractice. (Proposed Second Amended Complaint, Conklin Aff.Exh. A, ¶ 108.) Although the Second Amended Complaint does not specify the content of the alleged misrepresentations, plaintiffs' memorandum makes clear that they rely on Dr. Orentreich's assertions that the silicone injections were safe and his "willingness to continue to

perform the procedure" six or seven times after the initial injection, without disclosing the potential risks to Mrs. Detwiler. (Plaintiffs' Memorandum, at 13–14.)

▮ Those actions do not estop Dr. Orentreich from raising a statute of limitations defense. The fraudulent acts asserted by plaintiffs are the same acts on which Mrs. Detwiler bases her medical malpractice claim. Under plaintiffs' approach, Dr. Orentreich was committing malpractice and concealing it at the same time. Equitable estoppel may be invoked only when a physician conceals his prior malpractice, so the doctrine does not apply here.

Plaintiffs also appear to claim that Dr. Orentreich violated a continuing duty to inform Mrs. Detwiler of the potential consequences of the silicone injections: as they say, "This fraudulent conduct never ceased to be operational and was continuing and ongoing." (Proposed Second Amended Complaint, ¶ 109.) To the extent plaintiffs charge Dr. Orentreich with failing to provide information after he stopped treating Mrs. Detwiler, that failure does not estop him. Despite the fiduciary duty owed by physicians to their patients, physicians are "not required to contact and inform past patients of merely possible harms from treatment that they did not know was negligent or harmful." *Hoemke,* 720 F.Supp. at 47.

Thus, plaintiffs have not alleged the intentional fraudulent concealment necessary to estop Dr. Orentreich from raising a statute of limitations defense. Because plaintiffs' proposed amendment would be futile, their cross-motion to amend the complaint is denied. Dr. Orentreich's motion to dismiss the medical malpractice claim is granted.

## C. *Fraud Claim*

Dr. Orentreich argues that the complaint fails to state a claim for fraud because it does not allege facts from which his knowledge and intent to harm Mrs. Detwiler can be inferred, nor the additional elements of a fraud claim arising out of medical malpractice.

▮ Ordinarily, a physician's failure to disclose or concealment of her own malprac-

tice does not give rise to a cause of action in fraud or deceit separate from the customary malpractice action. *Simcuski v. Saeli,* 44 N.Y.2d 442, 452, 406 N.Y.S.2d 259, 264, 377 N.E.2d 713, 717 (1978). To establish such a fraud claim, a plaintiff must show, in addition to the elements of the tort of fraud, that: 1) the physician knew (or demonstrably had reason to know) of the fact of his malpractice and of the injury suffered by his patient in consequence thereof, *id.,* 44 N.Y.2d at 453, 406 N.Y.S.2d at 265, 377 N.E.2d at 718; 2) knowing them to be false at the time, the physician made material, factual misrepresentations to the patient with respect to the subject matter of the malpractice and the therapy appropriate to its cure, on which the patient justifiably relied, *id.;* and 3) damages which are distinct from those resulting from the malpractice flowed from the fraud. *Spinosa v. Weinstein,* 168 A.D.2d 32, 571 N.Y.S.2d 747, 753 (2nd Dep't 1991); *Harkin v. Culleton,* 156 A.D.2d 19, 554 N.Y.S.2d 478, 481 (1st Dep't), *appeal dismissed,* 76 N.Y.2d 936, 563 N.Y.S.2d 64, 564 N.E.2d 674 (1990). To be actionable, the fraud must occur after and separately from the malpractice. *Coopersmith v. Gold,* 172 A.D.2d 982, 568 N.Y.S.2d 250, 252 (3rd Dep't 1991); *Spinosa,* 571 N.Y.S.2d at 753.

Plaintiffs claim Dr. Orentreich committed fraud because he misrepresented the safety of the substance and failed to advise Mrs. Detwiler about the risks of the treatment. (Second Amended Complaint, ¶¶ 123–24.) They also allege that Mrs. Detwiler "sustained separate and distinct injuries," to wit an unnecessary and potentially dangerous course of treatment, and pain and suffering, as a result of the fraud. (*Id.* ¶¶ 131–32.)

▮ Those allegations do not state a claim for fraud. The allegedly fraudulent actions—inaccurate assurances of safety and failure to inform of the risks—are the same as those which form the basis for the malpractice claim for lack of informed consent. The fraud did not occur after the malpractice, as required by *Coopersmith* and *Spinosa.*

Nor does the Second Amended Complaint allege separate damages from the fraud.

Both it and the medical malpractice are alleged to have caused Mrs. Detwiler to undergo a treatment which she alleges she would have refused had she known the risks. As a result, she suffered the physical and psychological consequences of having silicone in her body, no component of which is attributable solely to the alleged fraud.

Plaintiffs misread *Harkin v. Culleton* as creating a distinction between the unnecessary procedures to which Mrs. Detwiler was subjected, on the one hand, and the "conditions and illnesses related to the presence of silicone in her body," on the other. (*See* Plaintiffs' Memorandum, at 26–27.) The former, plaintiffs allege, was caused by Dr. Orentreich's malpractice, while the latter was caused by his fraud. *Harkin* created no such distinction. Rather, *Harkin* held that the plaintiff could recover for both a physician's malpractice in misdiagnosing and incorrectly treating a brain tumor and for the physician's fraudulent concealment of the malpractice. Even after discovering the incorrect diagnosis, the physician continued the original radiation and chemotherapy treatment, thus allowing the tumor to grow. The court granted the plaintiff leave to replead to allege that he sustained brain damage as a result of the tumor's continued growth, which was caused by the fraud and not by the malpractice. However, the plaintiff could not recover in fraud for damages caused by the ineffective radiation and chemotherapy treatments which he underwent as a result of the malpractice. *Harkin,* 554 N.Y.S.2d at 481. Under *Harkin,* Mrs. Detwiler cannot recover from the effects of the silicone injections and she pleads no other damages.

Plaintiffs' motion to amend the complaint to add allegations regarding their fraud claim is denied.

### D. *Strict Products Liability Claim*

Plaintiffs seek to add a claim against Dr. Orentreich for strict products liability. They allege that Dr. Orentreich "designed, manufactured, tested, inspected, advertised, marketed, distributed and/or sold" the silicone he injected into Mrs. Detwiler's face. (Second Amended Complaint, ¶ 138.) They claim the silicone was defective and unreasonably dangerous, and that Dr. Orentreich failed to warn Mrs. Detwiler of the risks associated with its injection. (*Id.* ¶¶ 139–41.) Dr. Orentreich argues that he cannot be sued under a strict products liability theory because he used the silicone in the course of providing medical services.

■ Under New York law, a manufacturer, distributor, retailer, processor or maker of component parts who sells a product alleged to have caused injury may be liable under a strict products liability theory. *Blackburn v. Johnson Chemical Co.,* 128 Misc.2d 623, 624, 490 N.Y.S.2d 452, 454 (Sup. Ct.1985).

■ New York courts appear to have developed a rule that a physician cannot be liable in strict products liability for a defective product he administers when his provision of the product is incidental to the medical services. *See Goldfarb v. Teitelbaum,* 149 A.D.2d 566, 540 N.Y.S.2d 263, 264 (2nd Dep't 1989) (insertion of dental prosthesis was "only a procedure incident to medical treatment"); *Probst v. Albert Einstein Medical Center,* 82 A.D.2d 739, 440 N.Y.S.2d 2, 3 (1st Dep't 1981) (insertion of metal rod into plaintiff's spinal column was "incidental to the medical services provided"); *Perlmutter v. Beth David Hospital,* 308 N.Y. 100, 106, 123 N.E.2d 792 (1954) (in breach of warranty action, hospital not liable for tainted blood transfusion because the "supplying of the blood by the hospital was entirely subordinate to its paramount function of furnishing trained personnel and specialized facilities in an endeavor to restore plaintiff's health"). However, those cases (and the ones they cite) held that a physician who uses a product in the course of medical treatment is not a "seller" of that product. In none of them did the plaintiff claim that the physician manufactured or processed the product.

Here, plaintiffs do not attack Dr. Orentreich as a seller of the silicone. Rather, they claim he manufactured or "pharmaceutically altered" the silicone before he injected it into patients. They point to a 1981 document issued by the "Orentreich Medical Group" which states:

"The liquid injectable silicone (polysime-thylsiloxane) used in this office for more than 30 years is made by us from locally available liquid silicone. We pharmaceutically convert this material to a medical grade (100% pure, no additives—no particles, sterile, stored in glass) suitable for safe and effective soft tissue augmentation." (Conklin Aff.Exh. B, at 1.)

Dr. Orentreich's argument that pharmaceutically refining liquid silicone is not the same as manufacturing or processing it (Defendants' Reply Brief, at 16) presents a factual question not suitable for disposition on this record.

Plaintiffs' motion is granted to the extent it seeks to add a strict products liability claim against Dr. Orentreich.

### E. *Negligence Claim*

Plaintiffs propose to add a negligence claim against Dr. Orentreich, who they allege "failed to properly design, manufacture, test, inspect, advertise, market, distribute, and/or sell said silicone in a safe manner." (Second Amended Complaint, ¶ 148.) Plaintiffs also claim that Dr. Orentreich failed to warn Mrs. Detwiler about the risks of the silicone treatments. (*Id.* ¶ 149.) Dr. Orentreich contends that the negligence claim merely restates plaintiffs' strict products liability and medical malpractice claims.

Plaintiffs assert their strict products liability claim under both design defect and inadequate warning theories. Those theories are open to them to pursue, under the holding reached above allowing the product liability claim, and may include evidence that Dr. Orentreich negligently designed, manufactured, or failed to warn.

■ They may not, however, pursue a negligence claim against Dr. Orentreich for his treatment of Mrs. Detwiler. A patient may sue a physician or hospital under a negligence theory if "the common everyday experiences of the trier of the facts is sufficient in order to reach the proper conclusion." *Twitchell v. MacKay,* 78 A.D.2d 125, 434 N.Y.S.2d 516, 518 (4th Dep't 1980). For example, courts have allowed claims alleging negligence in leaving an electric light in a bed, spilling a flammable substance on sheets, applying a scalding hot water bottle to a patient, mistakenly administering a blood transfusion, and mistakenly dispensing drugs to patients. *See id.* But when a case "involves a matter of science or art requiring special knowledge or skill not ordinarily possessed by the average person," *id.,* expert testimony is required and the claim is one for medical malpractice.

■ Here, the degree of risk posed by the silicone injections and the medical community's knowledge, if any, of that risk during the period between 1978 and 1980 are not within the common knowledge of jurors. Nor is the standard of care adhered to by physicians part of jurors' everyday experiences. Thus, plaintiffs may not sue Dr. Orentreich in negligence for his medical treatment of Mrs. Detwiler, and their request for leave to amend to assert such a claim is denied.

### CONCLUSION

The medical malpractice and fraud claims are dismissed. Plaintiffs' motion to amend the complaint is granted only to the extent it (a) drops the battery claim, and (b) adds a claim for strict products liability and negligence in manufacturing, processing, or warning about, the liquid silicone.